## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                  No.16-CR-2904 MV

BRIAN TONY

        Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Brian Tony's Sentencing Memorandum [Doc. 339], which was filed on April 24, 2025. The government's Sentencing Memorandum [Doc. 338] was filed the same day. The Court held a sentencing hearing on July 16, 2025. Doc. 341. At the hearing, the Court, after having considered the memos, briefs, and relevant law, and being otherwise fully informed, sentenced Mr. Tony to 210 months in custody. Doc. 342. This Memorandum Opinion and Order reiterates and explains the Court's ruling.

### PROCEDURAL BACKGROUND

Mr. Tony was arrested in the instant case on June 3, 2016. Docs. 2, 3. He was initially charged by Criminal Complaint with Murder in the Second Degree. Doc. 1. On August 8, 2017, a Superseding Indictment charged him with First Degree Murder and two counts of Witness Tampering. Doc. 55. Mr. Tony first proceeded to trial in September 2017, after which a jury found him guilty of First Degree Murder and both counts of Witness Tampering. Doc. 114. This Court subsequently sentenced him to life imprisonment (the mandatory minimum) on the First Degree Murder conviction and 240 months on the Witness Tampering convictions to run concurrently with the First Degree Murder term of imprisonment. Doc. 150.

On January 27, 2020, the Tenth Circuit vacated the First Degree Murder conviction, finding that the Court had improperly excluded evidence related to self-defense, namely, evidence that the victim had consumed methamphetamine on the day that he was killed. Doc. 297 ¶ 3. The Tenth Circuit reversed with instructions for a new trial on the First Degree Murder charge. *Id.*

Mr. Tony proceeded to trial again in March 2022, after which a jury found him guilty of the lesser included offense of Voluntary Manslaughter. Doc. 275. On June 14, 2023, the Court held a sentencing hearing. Doc. 302. Prior to the hearing, the government and the defense each made objections to the previously disclosed presentence investigation report. Docs. 295, 297, 299. Most relevant was the defense's objection to the description of the offense conduct, specifically the statements indicating that Mr. Tony asked Mr. Doe to come with him before driving to Superman Canyon, that Mr. Tony brought the hammer to the scene, and that Mr. Tony was the initial aggressor. Doc. 315 at 57:17-58:2. The Court denied the objection and sentenced Mr. Tony to a total term of 210 months in custody: 180 months on the Voluntary Manslaughter conviction and 30 months on each of the two counts of Witness Tampering to run concurrently with each other and consecutively with the Manslaughter term of imprisonment. *Id.* at 58:59-10; doc. 304. This was a sentence within the guideline range. Doc. 315. The Court determined the guideline range by grouping the two Witness Tampering convictions with one another, but not with the Manslaughter conviction. *Id.*[1]

On November 20, 2024, the Tenth Circuit vacated Mr. Tony's sentence, finding that this Court had improperly failed to group the Witness Tampering convictions with the Manslaughter conviction for the purpose of determining the guideline range. Doc. 332. The Tenth Circuit

---

[1] The grouping of counts was the subject of the government's objection. The Court overruled the objection in part and sustained it in part. Doc. 315 at 66:2-7.

remanded the case for resentencing consistent with its opinion. The Court held a sentencing hearing on July 16, 2025, to resentence Mr. Tony according to the appellate court's order and judgement. Doc. 341.

## FACTUAL BACKGROUND

### 1. The Offense.

The instant offense occurred on the evening of May 8, 2016 and early morning hours of May 9, 2016, when Mr. Tony killed John Doe. On that day, Mr. Tony drove a Jeep belonging to his girlfriend (Colleen Begay) to a house he owned. Doc. 297 ¶ 8. Ms. Begay and Mr. Tony's brother (Bronson Tony) accompanied him in the car. *Id.* Once at the home, they encountered Mr. Doe along with Jonathan Mann, Mr. Tony's nephew. *Id.* Mr. Tony invited both men to join him on a drive, informing them that he had "something to show them." *Id.* Both men agreed, and Mr. Tony then drove all four passengers to an area of the Navajo Nation known as "Superman Canyon." *Id.* Mr. Mann's testimony suggests that, at some point before departing, Mr. Tony acquired and placed a hammer in the Jeep. *Id.* ¶ 16. Once at the canyon, Mr. Tony and Mr. Doe exited the car. *Id.* ¶ 14.

Shortly after midnight on May 9, 2016, Mr. Doe called 911 and reported that Mr. Tony had attacked him with a hammer at Superman Canyon, after driving him there in a Jeep. *Id.* ¶ 9; doc. 286-2 at 6. Mr. Doe specified that Mr. Tony had hit him on the head with the hammer, causing him to bleed badly. Doc. 297 ¶ 9. Mr. Doe begged for help, but he was unable to describe or provide directions to his location with specificity. *Id.* Eventually, Mr. Doe exclaimed that Mr. Tony was coming and pleaded with the operator to "hurry," at which point the call ended. *Id.*

Mr. Mann, who was present in the car that night, heard Mr. Doe screaming and sought to provide help, but Bronson Tony, who is about 260 pounds and a former bouncer, restrained him and instructed him not to intervene. *Id.* ¶ 14, 16; Trial Transcript March 7, 2022 at 69:4-5. At some

point, Mr. Tony returned to the car for several minutes before exiting again to "finish it." Doc. 297 ¶ 14. He then followed Mr. Doe over 200 feet into an arroyo, where he struck him with a large rock and stabbed him. *Id.*

Later that day, a passerby discovered Mr. Doe's deceased body at the bottom of a ravine—over a hundred and fifty feet from the road and in close proximity to a hammer and bloody 12-inch rock. *Id.* ¶ 10. According to the Office of the Medical Investigator, evidence from the scene, including footprints and handprints, suggested that an altercation between two people began at the top of a ditch before they descended to the bottom of the ditch, where the assailant attacked the victim—who tried to climb out—with the hammer and rock. *Id.* The Office of the Medical Investigator documented that during the encounter, Mr. Doe suffered the following injuries:

- Twenty stab and/or incised wounds to his head, including five that perforated his skull and one that entered his cranial cavity (penetrating his brain);

- Wounds consistent with hammer claw marks and three stab wounds to his neck;

- Multiple stab wounds and/or incised wounds to his left hand, including three that perforated his left hand and multiple incised wounds that severed tendons and joints;

- A stab wound penetrating subcutaneous tissue to his right arm;

- A chop-wound[2] to his head;

- A full thickness laceration to his forehead;

- Basilar skull fractures to the roof of his eye orbits;

- Two broken hand bones;

- Multiple blunt force injuries;

- Defensive posture wounds to his hands; and

---

[2] A chop-wound is a wound with features of blunt- and sharp-force injury. Doc. 297 ¶ 11.

- Skin scrapes and bruises to his face, thighs, knees, left index finger, right hand, and back.

*Id.* ¶ 10–11. The Office of the Medical Investigator deemed the cause of death homicide by multiple sharp and blunt force injuries to Mr. Doe's head and neck. *Id.*

In an interview with the FBI on May 14, 2016, Mr. Tony admitted to killing Mr. Doe, but asserted that he had done so in self-defense. *Id.* ¶ 12. Within the course of that initial interview, Mr. Tony gave many materially inconsistent statements. *See* doc. 283-3. First, he first reported as follows. On the evening of the instant offense, he went to go check on his house and was surprised to find Mr. Doe there. *Id.* at 3. Mr. Tony said that Mr. Doe asked him to go for a drive, to which he agreed, and then he and Mr. Doe were driven to Superman Canyon by a person he described as heavyset, bald, and Mexican. *Id.* at 4-5. Mr. Tony said that no one else left the house with them that night. *Id.* He stated that Mr. Doe initiated the two of them getting out of the car and walking into the canyon. *Id.* at 5. Mr. Tony reported that Mr. Doe hit him first and right after punching him, brought out a hammer, escalating the situation. *Id.* Mr. Tony claimed that he wrestled the hammer away from Mr. Doe, and then used it to hit Mr. Doe in the head. *Id.* at 6. Mr. Tony recalled that, during the fight, he sustained injuries from Mr. Doe on his arm. *Id.*

After the initial fight, Mr. Tony reported returning to stand near the car and observing the Mexican man still in the car shooting up. *Id.* Mr. Tony stated that when he returned to the car, Mr. Doe jumped down and slid into a ditch. *Id.* Mr. Tony claimed that he heard Mr. Doe speaking on the phone and saying people's names, including that of Mr. Tony and Mr. Tony's brothers. *Id.* Mr. Tony alleged that Mr. Doe threatened him with a knife from down in the ditch, and for that reason, Mr. Tony jumped into the ditch and began throwing rocks at Mr. Doe. *Id.* at 6-7. Mr. Tony reported stabbing Mr. Doe in the head after he himself was stabbed in his arm. *Id.* at 7. Mr. Tony claimed that he then walked home to Gallup, which took about eight or nine hours. *Id.* at 20. He admitted

5

that he left Mr. Doe lying in the ditch, bleeding. *Id.* at 7-8. Mr. Tony said he did not "plan on any of this…all [he] wanted to do was beat the crap out of him, you know." *Id.* at 15. This was Mr. Tony's initial account on May 16, 2016.

Just minutes after giving this first account, however, during that same interview, Mr. Tony changed his story dramatically. Specifically, he admitted that he in fact asked Mr. Doe to meet him at his house. *Id.* at 24. He admitted that his girlfriend and brother were out at Superman Canyon with him and Mr. Doe. *Id.* at 32. He admitted that he threw the first punch. *Id.* at 35.

Mr. Tony's testimony at his first trial was inconsistent with his accounts during his initial FBI interview. Indeed, at that trial, Mr. Tony admitted that he had lied to the police officer and FBI special agent investigating the case by inventing the Mexican man, who Mr. Tony had originally said drove him and Mr. Doe out to Superman Canyon. Trial Transcript September 28, 2017 at 181:13. Mr. Tony had fabricated the man's existence, as well as details about his clothing, hair, nationality, and car rims. Doc. 283-3 at 4-5. Likewise, Mr. Tony testified at trial that Mr. Doe had directed him to the site of the killing and that Mr. Doe was the initial aggressor, which contradicted one of his previous statements to the FBI. Doc. 297 ¶ 13; Trial Transcript September 28, 2017 at 70:22-23, 71:5-8, 181:1-20, 184:16-185:5. His testimony that Mr. Doe directed him to the site of the killing was also contradicted by Mr. Doe's seeming unfamiliarity with the area during his 911 call. Doc. 297 ¶ 13.

At the second trial, Mr. Tony made statements that contradicted his testimony at the first trial, his prior statements to the FBI, the testimony of Mr. Mann, and the physical evidence. For instance, he testified that he had started drinking after leaving Holbrook, while at the first trial he testified that he had started drinking while in Holbrook, and during his interview with the FBI initially said he did not drink at all. Trial Transcript March 8, 2022 at 139:4-19; doc. 283-3 at 2.

6

He testified that he had told the FBI about Mr. Mann's presence on the night of the offense—contradicting his May 2016 FBI interview and his testimony at the first trial. Trial Transcript March 8, 2022 at 120:7-12, 148:4-6; Trial Transcript September 28, 2017 at 182:2-4. He testified that he did not bring a hammer into the Jeep that night—contradicting the testimony of Mr. Mann, who stated that Mr. Tony had "grabbed the hammer" from inside the house. Trial Transcript March 8, 2022 at 38:15-19; Trial Transcript September 26, 2017 at 49:3. Finally, he told the jury that he had stabbed Mr. Doe about four times—contradicting evidence documenting over 20 stab wounds to Mr. Doe's head alone. Trial Transcript March 8, 2022 at 94:24-95:1, 166:22-24. He reiterated his testimony from the first trial that Mr. Doe was the initial aggressor. *Id.* at 83:2-4.

During the investigation of the death, Mr. Tony endeavored to have two witnesses, his girlfriend and his brother, falsify their testimony, and to prevent a third witness, his nephew, from testifying entirely, in an effort to evade being found responsible for Mr. Doe's death. Specifically, in a February 8, 2017 interview with the FBI, Bronson Tony, the defendant's brother, admitted that, at Mr. Tony's direction, he had previously lied about his presence on the night of the offense, falsely asserting that Mr. Tony had dropped him off earlier that evening. Doc. 297 ¶ 17. In another interview, Bronson admitted to being present but claimed, also at Mr. Tony's direction, that he was drunk and asleep in the backseat. *Id.* Bronson later admitted to instructing Mr. Mann not to intervene that night. *Id.* Mr. Tony also instructed Bronson to tell law enforcement that Mr. Tony had hurt himself fixing a fence. Trial Transcript March 8, 2022 at 136:23-25.

Likewise, Ms. Begay admitted that she had lied in two interviews with law enforcement at Mr. Tony's request. Doc. 297 ¶ 18. First, at Mr. Tony's direction, she lied about her presence on the night of the offense, falsely asserting that Mr. Tony left her at home that night. *Id.* She eventually admitted to being present on the night of the offense, but claimed to have been drunk

and asleep in the car. *Id.* In another interview, also at Mr. Tony's instruction, she lied about Mr. Mann's presence on the night of the instant offense. *Id.* She ultimately admitted that Mr. Tony had instructed her on how to testify so that she would avoid incriminating him. Trial Transcript March 8, 2022 at 125:5-7. Mr. Tony also sought to keep Mr. Mann from testifying for the grand jury or at trial, including through jails calls in which he gave instructions such as, "work on getting Joey out—at his family's house and don't bring him back." *Id.* at 148:24-149:2.

### 2. The History and Characteristics of the Defendant.

Mr. Tony is 51 years old and was born in Fort Defiance, Arizona, to Sherman Tony and Louise Tracey, who both raised him. Doc. 297 ¶ 67. Mr. Tony's mother sadly passed away in 2005, and his father passed away in 2009 while Mr. Tony was incarcerated. *Id.* Mr. Tony has five younger siblings and an older brother, Vincent, who tragically passed away following a fight. *Id.* ¶ 68-70. While Mr. Tony is not in frequent contact with his siblings, they have a positive relationship, and the defense describes that he is close with his large extended family. *Id.* ¶ 76.

Mr. Tony lived in the Gallup area of the Navajo Nation for most of his life. *Id.* ¶ 69. He describes his childhood as "good," but recalls having experienced physical abuse as a child, primarily from aunts and uncles who would beat him after coming home drunk. *Id.* ¶ 70. A 1989 psychological assessment from the New Mexico Youth Diagnostic and Development Center ("1989 Assessment") documents that "[t]he dynamics of this family appear to be based on strength, physical prowess and aggression." Doc. 295-1 at 3. The defense notes that his family excused and dismissed the abuse he experienced—attributing it to alcohol—and that as a result, Mr. Tony learned at an early age that he had to defend himself, because no one else would. Doc. 295 at 4-5.

The 1989 Assessment also discusses a series of traumatic events Mr. Tony experienced involving losing his loved ones. Doc. 295-1 at 3. Mr. Tony lost most of his close friends to sudden

death in a single year. *Id.* Specifically, two of his cousins passed away after hanging themselves. *Id.* Before they took their lives, they reportedly asked to see Mr. Tony, but he was not available at the time. *Id.* Another friend was killed in front of Mr. Tony's house, and another passed away following a car accident. *Id.* Mr. Tony described his friends and cousins as "brothers," and, according to the assessment, did not appear to process or share his grief with anyone, instead processing through alcohol. *Id.*

Mr. Tony attended school through the ninth grade before dropping out. Doc. 297 ¶ 98. While in school, he struggled with fighting and was suspended several times. According to records, he lost interest in school around the sixth grade, at which point he began skipping class—a time that coincided with the start of his substance abuse. Doc. 295-1 at 3-4. He later obtained his GED while incarcerated in 2008. Doc. 297 ¶ 98-99. While in custody, he also earned many certificates and participated in multiple educational classes, including college classes in computer drafting, building, and design. *Id.* In 2009, he received a certification in Computer Aided Drafting. *Id.*

Mr. Tony has work experience, including as a security guard, driver, carpenter, and laborer. *Id.* ¶ 103-05. Prior to his arrest in this case, he worked as a contract mechanic for Cash Cow Auto Sales, which indicated that they hope to hire him for a full-time permanent position in the future. *Id.* ¶104. Additionally, Mr. Tony held multiple jobs while in BOP custody. *Id.* ¶ 107. Through his work, Mr. Tony has developed specialized skills and training in auto mechanics, carpentry, and plumbing. *Id.* ¶ 108. While Mr. Tony has been incarcerated for much of his adult life, prior to the instant offense he achieved some success on supervised release, including by participating in weekly counseling, working a regular job, and maintaining housing. *Id.* ¶ 91, 108.

Physically, Mr. Tony suffers from several medical issues, including Type 2 diabetes, myopia, migraine headaches, nerve damage in his left arm, asthma, hypertension, acid reflux,

cellulitis, spondylosis, and pain in his back, knees, foot, hand, and hips. *Id.* ¶ 77, 79, 80; doc. 339 at 3-5. He also suffers from Hepatitis C, which has resulted in an enlarged and fatty liver and an enlarged spleen. Doc. 297 ¶ 79. He previously received treatment for the virus, but recently tested positive again. Doc. 339 at 5. The defense reports that he has struggled to control his blood sugar in prison, given the limitations on medical care. *Id.* at 4. He has suffered from several skin infections connected to his diabetes, including a severe infection in his chest wall. *Id.* at 5. Mr. Tony's health, including but not limited to his diabetes, has worsened while he has been in custody. *Id.* He does not have access to easy glucose monitoring despite a doctor's order that he have blood glucose testing twice a week. *Id.* at 3-4. His A1C at recent checks have been 8.3% and 9.3%, well over both the American Diabetes Association standards and even the BOP guidance on diabetes management. *Id.* at 4-5. Recently, he has begun experiencing issues with his thyroid. Sentencing Hearing Transcript ("Sent. Tr.") at 19-25.[3]

Mr. Tony also has a history of mental health challenges, for which he has undergone several evaluations. First, the 1989 Assessment finds Mr. Tony to be easily angered, impulsive, and known to react aggressively towards others. Doc. 295-1 at 4. The 1989 Assessment discusses how his family life was intertwined with and dependent upon violence, with each person responding to the others with physical challenges, resulting in Mr. Tony's "only anger management skill [being] to hit someone." Doc. 295-1 at 4. The 1989 Assessment describes how his family "appear[ed] to experience almost daily aggression from and towards other people" and how a culture of drinking "appears to intensify this pattern." *Id.* Notably, the 1989 Assessment reports that Mr. Tony's values "are so concrete and socially marginal that the concept of remorse for hurting anyone outside of

---

[3] The Court's citations to the transcript refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

his family is alien to him." *Id.* Additionally, the 1989 Assessment documents that he had previously attempted suicide via overdose, which resulted in hospitalization. *Id.* at 3.

Approximately one year later, an assessment from the New Mexico Department of Corrections ("1990 Assessment") was conducted, which similarly describes Mr. Tony as impulsive, easily angered, and capable of acting aggressively to others, and notes that his use of alcohol and substances complicated such behavior. *Id.* at 1. The 1990 Assessment notes that Mr. Tony seemed to have no continuing stable relationships outside of his immediate family, was not inclined to trust authority figures, and suffered from low self-esteem. *Id.* The 1990 Assessment finds that Mr. Tony lacked the skills necessary to form and maintain important social ties. *Id.* Finally, the 1990 Assessment notes that Mr. Tony seemed to make some progress in therapy, evincing some self-awareness, showing the ability to take responsibility for some of his actions, and exhibiting some remorse. *Id.*

Most recently, a 2015 biopsychosocial assessment from A New Awakening ("2015 Assessment"), diagnosed Mr. Tony with Antisocial Personality Disorder, Severe Cannabis Use Disorder, and Severe Alcohol Use disorder. *Id.* at 25. The 2015 Assessment discusses Mr. Tony's pervasive lack of remorse and difficulties respecting rules and authority. *Id.* at 24. Like the previous reports, the 2015 Assessment notes Mr. Tony's issues controlling his anger and how his anger issues interact with his substance abuse. *Id.* at 23-25. Consistent with his assessments, Mr. Tony has shown a lack of remorse in this case. He was heard on jail calls mocking the family's placement of a cross for Mr. Doe because it was at the top rather than the bottom of the ditch, where Mr. Doe actually died. Doc. 297 ¶ 23.

Mr. Tony has received some counseling to address his mental health. Prior to his first trial, he participated in bi-weekly counseling (often at his request), which he described as somewhat

beneficial, but he stopped attending after the first trial. *Id.* ¶ 83, 91. He has also engaged in substance abuse treatment and weekly counseling (also at his request) through the Raton Alcohol/Drug Program and Community Mental Health Services. *Id.* ¶ 86. He previously attended monthly sessions at Synergy Behavioral Health Center while on supervised release for a prior conviction. *Id.* ¶ 90.

In addition to his mental health struggles, Mr. Tony also has a serious history of substance abuse, which appears intimately connected to the instant offense, during which he was intoxicated. *Id.* ¶ 93. He identifies his primary substances as alcohol and marijuana, which he first used at ages nine and ten, respectively. *Id.* ¶ 94, 96. He reports having previously consumed three fifths of alcohol and several cases of beer per day, explaining, "we used to buy out the whole store." *Id.* He also notes that his family has a substantial history of drinking. *Id.* He reports that he previously consumed about a quarter pound of marijuana per week, purchasing quarters every two days. *Id.* While he has previously achieved sobriety, he relapsed prior to the instant case. *Id.* He has received some treatment for his substance use, including while in BOP custody. *Id.* ¶ 95. Records also document that he received treatment at the New Mexico Boys School, where, notably, he sought out additional weekly therapy on his own. Doc. 295-1 at 1.

Mr. Tony has an extensive criminal history. Doc. 297 ¶ 41-64. He has ten adult criminal convictions. *Id.* ¶ 41-51. Even more than the number of convictions, the Court is struck by some of the facts underlying his prior convictions. For instance, this is not the first time Mr. Tony has taken the life of another man: at age 17, he incurred his first adult conviction for aggravated assault after he jumped on the chest of another person until that person's ribs and sternum caved in, leading to death. *Id.* ¶ 42. At the time of the instant offense, Mr. Tony was on supervised release for another crime, in which he forced open the door to an elderly Navajo couple's home, slugged the man in

the face, and then struck both individuals over the head with a hatchet. *Id.* ¶ 49. After the elderly couple collapsed to the floor, Mr. Tony absconded with a stereo. *Id.* The couple both sustained skull fractures and their severe head trauma required them to be flown to Arizona for three days of hospitalization. *Id.*

Mr. Tony's known history of violence goes beyond his criminal convictions. In her trial testimony, Mr. Tony's sister admitted that arguments between the two of them had previously become physical. Doc. 315 at 80:25-81:2. In addition, and most recently, Mr. Tony's disciplinary record suggests a continued pattern of violence. While in prison for the instant offense, during which he stabbed someone to death, he was found with a five-and-a-half-inch icepick type of device. Sent. Tr. at 7:7-11.[4]

## DISCUSSION

Pursuant to *United States v. Booker*, this Court must consider the advisory United States Sentencing Guidelines as well as each of the additional factors stated in 18 U.S.C. § 3553(a) in imposing a reasonable sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a). *See United States v. Booker*, 543 U.S. 220, 245 (2005). Section 3553(a) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a). It also requires the Court to impose a sentence that complies with the purposes of sentencing, which include (1) retribution, (2) deterrence, (3) incapacitation, and (4) rehabilitation. *Id.*

In addition to the §3553(a) factors, the Court is mindful that "the Sentencing Guidelines deserve careful consideration in each case and because they have been produced at Congress's

---

[4] Mr. Tony appealed this disciplinary report, but the appeal was never processed because Mr. Tony was transferred to a different facility. Sent. Tr. at 28:18-24. Thus, as the defense stresses, the disciplinary report reflects only a preliminary finding. *Id.*

direction, they cannot be ignored." *United States v. Grober,* 624 F.3d 591, 609 (3d Cir. 2010). At the same time, however, the Court recognizes that a district court has the discretion to vary from the recommended guidelines when a sentence outside the guideline range is sufficiently justified. *Gall v. United States*, 552 U.S. 38, 46 (2007). A court does not need to find "exceptional circumstances" to sentence above or below the guideline range. *Id.* at 47. Likewise, there is no precise mathematical formula a court can use to develop an appropriate sentence. *Id.* at 47-49. Rather a district court is always bound to examine the individual circumstances of the case and the defendant to sentence accordingly, whether within the guidelines or not. *Id.* at 49-50. The Tenth Circuit has recognized that a case being outside the "heartland," or involving conduct different than that of people convicted of the same charge, is a very convincing ground for a variance. *United States v. Vazquez-Garcia*, 130 F.4th 891, 899-900 (10th Cir. 2025) (a technical heartland analysis is necessary only when providing reasoning for a departure, not a variance, but recognition of conduct as outside the heartland can constitute a convincing ground for a variance). Considering the circumstances of the case, the sentencing guidelines, and the § 3553(a) factors, the Court finds that a sentence of 210 months in custody is appropriate.

The Offense Level is 31 and the Criminal History Category is III. Doc. 336 at 1. The guideline range is therefore 135 to 168 months. *Id.* The government recommended an upward variance to 210 months. Doc. 338 at 5. Probation recommended a sentence of 168 months. Doc. 339 at 1. In briefing, Mr. Tony requested a time-served sentence. Doc. 339 at 6. At sentencing, Mr. Tony requested a guideline sentence. Sent. Tr. at 29:11-12.

In deciding Mr. Tony's sentence, the Court seriously considered the circumstances of the offense and those of Mr. Tony's life, including and especially those highlighted by the defense as mitigating. In briefing and argument, Mr. Tony emphasized that the calculated guideline range is

higher than the average sentence for voluntary manslaughter cases, that he suffers acute physical health problems, which continue to worsen, and that his time in the Bureau of Prisons has been particularly punitive because of the understaffing, his health concerns, and his lengthy period awaiting a second trial and multiple sentencings. Doc. 339 at 1-7; doc. 295 at 11, 14-15. Specifically with regard to his personal history and characteristics, Mr. Tony's sentencing memoranda discussed the physical abuse that he endured as a child, his long-standing mental health struggles, the alcoholism and aggressive behavior apparent throughout his entire family, the devastating loss of close friends and family, his substance abuse, and the work that he has done while incarcerated to address his mental and emotional health. Doc. 295 at 4-7, 13-14. As to the nature of the crime, Mr. Tony's sentencing memoranda argue that because he was acquitted of murder and found guilty of the lesser included offense of voluntary manslaughter, the jury must have found Mr. Tony's testimony credible. *Id.* at 3-4.

This Court believes Mr. Tony's sentence should be higher than the average imposed for voluntary manslaughter cases because the crime was well outside the "heartland" of voluntary manslaughter. Mr. Tony's conduct was extreme. He stabbed Mr. Doe more than 20 times. Doc. 297 ¶ 10-11. He used a rock, a hammer, and a knife, when certainly one of those weapons alone would have been sufficient. *Id.* The defense claims that by virtue of its verdict, the jury must have believed Mr. Tony's testimony at the second trial that he did not put the hammer in the car, that he did not bring Mr. Doe to Superman Canyon, and that he was not the initial aggressor. Doc. 315 at 30:25-31:11. However, in overruling Mr. Tony's objections to the factual findings in the PSR, the Court specifically rejected this argument. *Id.* at 57:15-59:10. The Court did not agree then, and does not agree now, that the jury verdict, by necessity, reflects that the jury believed Mr. Tony's entire testimony. *Id.* at 58:20-22. Further, as the Court also explained in overruling Mr. Tony's

objections, the Court found, and continues to find, that the evidence established by a preponderance of the evidence that Mr. Tony *did* put the hammer in the car, *did* bring Mr. Doe to Superman Canyon, and *was* the initial aggressor.[5] Doc. 315 at 58:13-59:10. To make this finding, the Court relies upon Mr. Mann's testimony, the recording of the 911 call, Mr. Tony's prior statements, and the absence of any evidence to the contrary other than Mr. Tony's self-serving and uncorroborated trial testimony. *Id.* Thus the facts demonstrate by a preponderance of the evidence that Mr. Tony's killing of Mr. Doe was extremely brutal.

The Court is concerned about Mr. Tony's diabetes and physical health concerns, which the Court knows are difficult to manage in custody. The Court does find that Mr. Tony's childhood trauma, the losses he has endured, and his struggles with his mental health and substance abuse are mitigating circumstances, and takes them into account in determining a sentence that is

---

[5] Under a 2024 amendment to U.S.S.G. § 1B1.3, sentencing courts cannot generally consider federally acquitted conduct when calculating the appropriate guidelines range. U.S.S.G. § 1B1.3(c). Specifically, U.S.S.G. Amendment 826, which took effect on November 1, 2024, amended U.S.S.G. § 1B1.3 by adding a subsection (c) that excluded as relevant "conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." *Id.* However, that limitation only applies to relevant conduct used to calculate the guidelines range. For other uses at sentencing, such as justifying a variance, acquitted conduct can still be considered if the court determines that the conduct occurred by a preponderance standard. Amendment 826 expressly clarifies that it does not abrogate 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Supreme Court and Tenth Circuit case law permit sentencing courts to consider acquitted conduct as relevant conduct during sentencing if the judge finds that the conduct satisfies a preponderance standard. *See, e.g.*, *Witte v. United States*, 515 U.S. 389, 397-401 (1995); *United States v. Vigil*, 476 F.Supp.2d 1231, 1245 (10th Cir. 2007). While Amendment 826 supersedes this case law for any determinations used to calculate the guidelines range, those precedents and 18 U.S.C. § 3661 remain undisturbed for other determinations made at sentencing. The Court does not believe that the conduct in this case is necessarily acquitted conduct (though the defense claims it is a necessary following from the jury verdict). Regardless of whether the jury could not find these facts beyond a reasonable doubt or did not find it necessary to decide them to reach their verdict, the Court believes they have been established by a preponderance of the evidence. *See* doc. 315 at 59.

sufficient but not greater than necessary to achieve the goals of sentencing. Likewise, the Court acknowledges the difficulty of living in prison for an extended period of time, with deteriorating health and partially during the COVID-19 pandemic. Unfortunately, due to the state of our country's prisons and jails, many if not all defendants who appear before this Court for sentencing face similar difficulties. Ultimately, the Court believes that the mitigating evidence in this case is overcome by the brutality of the instant offense, Mr. Tony's lack of remorse, his repeated attempts to lie or prevent this Court from receiving the full and accurate testimony of witnesses, and his long track record of violence.

With respect to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to promote public safety, the instant offense was incredibly violent. Mr. Tony ended the life of another man and then attempted to interfere with the investigation of the crime. Mr. Doe did not just die, he suffered for a lengthy period of time, as evidenced by his 911 call. Doc. 286-2. The extent of his injuries show that his death was not quick and painless. The Court is alarmed not only by Mr. Tony's actions on May 8 and May 9, 2016, but also by his choices since. In addition to the witness tampering, for which Mr. Tony was convicted, Mr. Tony also showed a disregard for law enforcement by repeatedly lying and giving inconsistent statements, not only during his initial interview but also at his two trials. Even more, however, the Court is concerned by Mr. Tony's utter lack of remorse, which is perhaps best illustrated by the jail call during which he mocked the placement of the family's cross for Mr. Doe, declaring it to be at the wrong place, not where Mr. Doe actually died. Doc. 297 ¶ 23. A serious custodial sentence is warranted to reflect the depth of the pain and suffering that Mr. Tony inflicted, not just upon the victim, but also upon the victim's loved ones.

With respect to deterrence, Mr. Tony's criminal history—which includes ten prior adult convictions—is both extensive and brutally violent. Doc. 297 ¶ 41-51. Critically, as noted above, this is not the first death for which Mr. Tony has been judged responsible. *Id.* ¶ 42. When he was 17 years old, he jumped up and down on the chest of another person leading to that person's ribs and sternum caving in. *Id.* The victim suffocated and died. *Id.* More recently, Mr. Tony broke into the home of an elderly Navajo couple, punched the man in the face, and then struck both him and his wife over the head with a hatchet, ostensibly to steal their stereo. *Id.* ¶ 49. Both elderly victims required emergency treatment and were hospitalized for three days. *Id.* This consistent history of violence towards others is deeply concerning to the Court.

With respect to rehabilitation, Mr. Tony has a history of mental health and substance use challenges for which he would benefit from treatment. Doc. 295-1. His substance use has intersected dangerously with his mental health issues, which played a pivotal role in the instant case, during which he was intoxicated. Trial Transcript March 8, 2022 at 139:4-19. In particular, Mr. Tony has diagnoses for Antisocial Personality Disorder, Severe Cannabis Use Disorder, and Severe Alcohol Use disorder. Doc. 295-1 at 25. Notably, Mr. Tony has participated in counseling and substance abuse treatment in the past, including at his own request, suggesting he would be a strong candidate for treatment going forward. Doc. 297 ¶ 83, 91. While he relapsed prior to the instant case, his past attainment of sobriety suggests that with robust treatment, he could again achieve sobriety in the future. In addition, Mr. Tony has intensive physical health issues and spent the majority of his adult life in custody; for both of those reasons, he likely will require a great deal of support in transitioning to the community after his release from prison. *See* doc. 297 ¶ 77, 79, 80.

At Mr. Tony's sentencing hearing on July 16, 2025, defense counsel objected to the 210-month sentence imposed. Sent. Tr. at 86:4-5. Defense counsel objected on the grounds that the sentence was procedurally and substantively unreasonable, depended on double-counting Mr. Tony's inconsistent statements against him, since he was also convicted of and sentenced on charges of witness tampering, and was suggestive of retaliation because the Court did not previously make a finding that the crime was unusually brutal at Mr. Tony's prior sentencings. *Id.* at 86:10-88:6. The defense also noted that this Court originally misstated Mr. Tony's sentence as to his Manslaughter conviction as 210 months, when in fact the total sentence was 210 months, with the sentence imposed as to the Manslaughter conviction being only 180 months (the statutory maximum). *Id.* at 87:5-9.

To determine a procedurally reasonable sentence, a district court must correctly calculate the guideline range, but not treat that guideline range as mandatory, consider the § 3553(a) factors, base the sentence upon properly established facts, and adequately explain the sentence. *United States v. Cookson*, 922 F.3d 1079, 1091 (10th Cir. 2019); *see also Gall*, 552 U.S. at 51. In this case, the parties agree that the correctly calculated guideline range is 135-162 months. Doc. 336 at 1. Based upon the facts that this Court has found by a preponderance of the evidence in conjunction with the § 3553(a) factors, the Court has decided to vary upward, thereby not treating the guidelines as mandatory. This Court explained its reasoning for the upward variance as stated above. Namely, this Court believes that Mr. Tony's crimes are well outside the heartland. In more than thirty years on the bench, this case stands out as one of the most brutal killings this Court has seen. *See* doc. 315 at 55. This Court is concerned by Mr. Tony's marked lack of remorse, his lying, his efforts to manipulate witnesses, and his long history of violence.

Defense's assertion that the Court improperly engaged in double counting by considering Mr. Tony's persistent lying when determining to vary upward is unavailing. The Court is well within its discretion in considering Mr. Tony's lying, despite his conviction for witness tampering. *See United States v. Barnes*, 890 F.3d 910, 921 (10th Cir. 2018) ("District courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory guidelines range.").

This Court is shocked by the depth of Mr. Tony's concealment and misdirection. He attempted to get Mr. Mann, Ms. Begay, and Mr. Bronson Tony to refrain from testifying altogether or to perjure themselves and testify falsely in his favor. Doc. 332-1 at 3. These attempts were the bases of his witness tampering charges. *Id.* Mr. Tony also lied repeatedly to law enforcement during the investigation of the crime. *Id.* He made up an entire person and gave detailed lies about that person's nationality, appearance, and even car rims. Doc. 283-3 at 4-5. The lies that Mr. Tony told law enforcement during the investigation of the crime, as well as his request that Mr. Bronson Tony lie about even being present during the crime, form the bases of the obstruction of justice enhancement.[6] Doc. 332-2 at 6. In addition to these myriad instances of dishonesty and obstruction, Mr. Tony also gave inconsistent accounts at trial, meaning he lied under oath at, at least, one point or another. His lies were specific and continuous, from the start of the investigation and throughout two trials. The aggregate total of Mr. Tony's dishonesty is sufficiently egregious and shocking to

---

[6] The jury instructions regarding the witness tampering charges at trial discuss only Mr. Tony's conduct in reference to Mr. Mann and Ms. Begay, but in the indictment both witness tampering counts are predicated on Mr. Tony's conduct regarding Mr. Mann, Ms. Begay, and Mr. Bronson Tony. Doc. 332-2 at 3. This Court, relying on the jury instructions, based Mr. Tony's witness tampering convictions upon his conduct regarding Mr. Mann and Ms. Begay, and not Mr. Tony at his second sentencing. Doc. 315 at 60:15-23. The Tenth Circuit, however, stated that the two witness tampering convictions, per the indictment, rest upon his conduct toward Mr. Bronson Tony as well. Doc. 332-2 at 3.

allow the Court to consider it a § 3553(a) factor even though it, in part, has been considered in determining the guideline range. *See Barnes*, 890 F.3d at 921.

Defense counsel is simply wrong that, until this juncture, the Court never indicated its belief that the circumstances of the instant crime were exceptionally brutal. Contrary to defense counsel's argument, this Court not only has consistently emphasized its finding that the instant crime was extremely brutal, but also expressed its concern regarding both Mr. Tony's criminal history and his lack of remorse. At Mr. Tony's second sentencing hearing, the Court noted the "exceptional violence" that Mr. Tony exhibited. Doc. 315 at 67. In addressing Mr. Tony, the Court remarked: "your case has been shocking to me in the extent of the violence and in the number of lies that I heard from you; the specificity of the lies, the constant lies, that has just been shocking to me." *Id.* at 55. As the government aptly noted, because the sentence imposed at the second sentencing hearing was a within-guidelines sentence, it was not even necessary for the Court to opine as to the extreme nature of the instant offense at that time. Sent. Tr. 88:18-89:11. Yet it did so anyway. In short, even when it was not done to justify an upward variance, this Court has clearly and consistently identified Mr. Tony's conduct as brutal, violent, and extreme. *See* doc. 315 at 53-54, 55, 56, 67; Sent. Tr. at 89:14-25.

The Court also disagrees with defense counsel that a 210- month sentence is substantively unreasonable. *See Barnes*, 890 F.3d at 915 (describing the standard for substantive reasonableness). The defense argued that the 210-month sentence imposed disregards the jury's verdict and punishes Mr. Tony for murder, but that is incorrect. *See* Sent. Tr. at 25:13-21. For the reasons explained above, the Court does not agree that the jury's verdict necessarily reflects that jury found his entire testimony credible. It follows that the Court's sentence does not disregard the jury's verdict. Nor does the defense explain how a 210-month sentence punishes Mr. Tony for

murder. Indeed, when Mr. Tony was initially convicted of murder, he was sentenced to life in prison – this is a very different sentence than 210 months. Doc. 150.

Finally, the defense argues that the only sentencing factor that has changed since Mr. Tony's second sentencing hearing is the guideline range, and because the guideline range has gone down while all other factors regarding the crime and Mr. Tony have remained the same, Mr. Tony's sentence should be reduced in keeping with the guideline range. Doc. 315 at 35:5-15, 86:20-25. The defense's argument continues that, by instead sentencing Mr. Tony to the same sentence previously imposed, the Court is punishing him for engaging in the appeals process. *Id.* at 35:1-4, 87:19-20. This is simply not true. The Court's sentencing decision is in no way motivated by a desire to punish Mr. Tony for engaging in any aspect of the process to which our legal system (thankfully) affords him. Indeed, the Court has repeatedly noted its utmost respect for the appeals process. *See* doc. 315 at 52:23-53:5 ("I want to speak to the fact that you have been waiting seven very long and painful years. That was my fault. This Court made an evidentiary ruling that was wrong, and it was an important one, and it affected the rights of Mr. Tony, and it was right for the Court of Appeals to reverse that trial, that first trial. And it was right for the Court to have a second trial because that was an important error that I made in the first trial.").

As is its duty, the Court seriously considered the change in the guideline range, along with the other § 3553(a) factors, in determining Mr. Tony's sentence. Ultimately, however, this Court, as it has noted many times throughout this case, feels that Mr. Tony's actions in the instant offense and his violent history are extremely brutal and well outside of the heartland of Voluntary Manslaughter cases. Because the Court finds that the facts of this case and the history and characteristics of Mr. Tony are singular and striking, the Court bases its sentence determinations largely upon its consideration of the § 3553(a) factor considerations, rather than the guidelines

range, which, after all, is meant to address heartland cases. For these reasons, the Court believes that a sentence of 210 months of incarceration is appropriate.

## CONCLUSION

After giving serious consideration to the severity of the crime, Mr. Tony's history and personal nature, the guidelines, and each of the factors set forth in § 3553(a), the Court concludes that a sentence above the guidelines range is warranted, specifically a sentence of 210 months of incarceration.

**IT IS ORDERED** that an upward variance is appropriate, and that Mr. Tony is sentenced to a term of 210 months incarceration with three years of supervision to follow.

ENTERED this 7th day of August 2025.

_____
MARTHA VÁZQUEZ
SENIOR UNITED STATES DISTRICT JUDGE